25-5241 et al. Perkins Coie LLP v. DOJ et al. Mr. Combley for the appellant, and Mr. Clement for the appellant. Good morning, counsel. Good morning. Mr. Combley, please proceed when you're ready. Thank you, Your Honor. I'll be shade Combley for all the defendants here, and may it please the court, I'll reserve five minutes of time for rebuttal. President Trump is not beneath the law. He is entitled to the benefit of the Supreme Court in this court's precedent on his authority to decide matters such as security clearance determinations and investigating anti-discrimination. But the district courts here rushed a judgment on executive orders that they clearly didn't like the content of, and in the process granted relief that they were not authorized to do, such as restoring security clearances, which this court's binding precedent says is off limits. And this appeal is about correcting those errors. Starting with security clearances, it's important to understand what the plaintiffs were asking for in this case and the relief that the district court granted. They were asking for nullification of the president's security clearance determinations. And as far as I'm aware, no appellate court nor the Supreme Court has ever said that that is relief authorized under the political question doctrine. The political question doctrine has repeatedly stated that who gets access to classified information is constitutionally committed to the executive, and the courts cannot review it. And constitutional commitment is different than, for instance, a statutory bar on review. So a statutory bar, there's some avenue for a court to review. But if the Constitution commits the decision to be executive, that's when it's solely in the executive's hands. And when you're talking about political question, it deals with what the subject matter is and who gets to decide it, not necessarily on how that person or the body entrusted comes to that decision. So the constitutional commitment in this case, in Egan, has held that it stems from Article II, Section 2 of the Constitution, and it flows directly from the commander-in-chief's power to be the commander-in-chief of the Army and the Navy. The constitutional commitment has also been there in historical practice. In World War I, it was the executive branch that created the classification system and controlled access to it. The power to determine who controls or who gets to access classified information has never been circumcised by Congress, which is another reason why it's dedicated to the executive. So there's three questions that are worth asking in determining whether the relief for Section 2 is allowed. One, is the injury tied to a loss of a security clearance? Two, is the relief that they're seeking restoration of security clearances? And three, does resolving the merits involve looking at the motives behind the president or the executive branch? And the way that – Can I ask you a question about – which may intersect with your third one, but I kind of view it as an antecedent question. So suppose – and it's just hypothetical – but suppose you have a situation in which the decision-maker about the security clearance announces the decision in the following way. My decision to revoke a security clearance has nothing to do with whether the person whose clearance is being revoked can be entrusted to keep the nation's secrets. It has something to do with a consideration that's entirely extraneous to whether the person can keep the nation's secrets and then lists the consideration. It would be something that self-evidently doesn't have anything to do with the risk of disclosure. If that were the decisional basis and it were just set out and it were admitted, would your argument still be the same? And let's actually – I'm sorry to lay it on, but let's just say it has to do with the person's speech. They gave some speech that I find distasteful. It was anti-government speech. I find it distasteful. But I'm not worried about their keeping the nation's secrets. I'm not worried about disclosure. I just don't like it, and therefore, I'm going to revoke the security clearance. Would all the arguments you're making about the security clearance part of the case apply equally? Yes, Your Honor, and that's because that's what this circuit's precedent compels. So the reason for that – so like, let's say Title VII or anti-discrimination. In Lee, for instance, there was a claim that my security clearance was suspended solely because of my Chinese ancestry, and that was decided in a motion to dismiss posture where the court assumes all the facts that lead up to the claims are true. And they said before we even get to that question, we have to determine if we're authorized or competent. But I think in almost every situation – and I'm not aware of a situation that's different – the security clearance determinations have been under the auspices of the executive order regime that's set up for clearances. Sure. And that executive order on its face talks about the considerations that are taken into account and the reason that the decision is being made. And the reason that the decision is being made is for the normal reasons we'd assume a security clearance decision is being made because of trustworthiness, which is specifically itemized as a consideration, and that seems to have some load-bearing weight. And so whenever a decision is made under that architecture, the assumption, the overriding assumption and conclusive assumption maybe, is that the decision's been made for that reason, and you can't look behind that. You can assert that the decision, in fact, wasn't grounded in that. It was grounded in something different, like my ancestry, but the doctrine precludes looking behind that. So I was asking a little bit of a different question, which is if the actor admits that the decision isn't based on any of those criteria, so it's not requiring looking behind what is facially the right consideration. You're actually looking in the face of something that's not the normal consideration. In that circumstance, you still think it's non-justiciable. So, Your Honor, the executive orders and the different things that they talk about, they obviously apply to the agency, but the core constitutional commitment is given to the president, so it's similar to the pardon power, where even if it's for improper motives, it is still ultimately unreviewable. And there's no judicially manageable standards either for resolving that, because security clearances are ultimately an affirmative declaration that someone meets the characteristics, and we look behind speech all the time in determining whether to grant or deny security clearances. And here we also have mixed motives in this case. So even if there is some hypothetical scenario, here there's some motives that the court would have to parse apart. But I'm hypothesizing not a mixed motive case. I'm hypothesizing one where there's only one motive, and it's not the normal motive. And your view is the pardon power example is where you go, which is that this power over security clearances is so intrinsic that even – so it could be race-based, and it could be race-based, and it has nothing to do with trust of a particular race. It could be I'm denying a security clearance because of the race of the person who has it, and I actually don't have any concerns about whether they can be trusted with the information. I just don't want that person to have it. So, Your Honor, my answer to that is one. You know, Lee says that before you look to any of that, to whatever the motives were, so even if the motives were on their face, you still have to decide whether it's reviewable before you examine the facts. But that one would be unreviewable in your mind? Yes, so there's other remedies to address that. So, for instance, Congress could always circumscribe the president's authority in the security clearance realm. They can impeach him, and there's ultimately the ballot box in elections. And ultimately, it's the case where one provision of the Constitution is butting up against another. Article 2 is just as important as every other part of the Constitution, and Lee describes it as a textual commitment to the president. So if that textual commitment exists, it has to exist in every scenario before you even look towards what the facts of the case are. So the incoming president, imagine, is of a different party from the outgoing president. And I want you to focus a little bit on the equation here of the trustworthiness of counsel and the trustworthiness of their clients, because a lot of the basis of these orders is the clients whom the law firms affected chose to represent. So if you had an incoming president, let's say, after Watergate, instead of the prosecutions happening under the Nixon and Ford administrations, they happened under the Carter administration. And President Carter said, boy, you know, Ehrlichman, Haldeman, those people are crooks. They're dangerous to the national security, and they need cleared counsel to defend themselves against charges. But, you know, those counselors are sleazy. I'm going to deprive them of security clearance. And anybody who wants to represent those people, I'm going to deprive them of security clearance. No problem? So, Your Honor, it's not about whether there's a problem or not. It's about whether the Constitution still takes effect. No reviewability. No, Your Honor, because it's ultimately a threshold issue before you even look at the facts of that case, and that's what Lee has held throughout. And the other issue is, in this particular case, there's never been a circuit court that has ever ordered the restoration of security clearances. And this one actually goes – the district court order goes one step further. They order restoration of the security clearances that were suspended, and it prohibited even individualized review if it was – Could you also carve out the ability of the executive to do individualized security clearance determinations about anybody? So, Your Honor, they say that if it's done pursuant to Section 1, it's prohibited. And I'll explain why that doesn't work in the context of a motion to enforce the preliminary injunction. So let's just say we have a hypothetical scenario where, you know, the court could divorce the claims from a merits determination, and the court could clear everything by turning back on security clearances. If we had an independent reason to demonstrate that or to say that someone within these plaintiffs should not have a security clearance, what would happen is my colleague on the other side would file a motion to enforce the preliminary injunction, and we would have to explain to the court why it is that we did it and how it's divorced from Section 1. And that's the type of question that Lee says we cannot ask. So that's why I focused on the remedy quite a bit because courts have been clear – there's never been a court that ordered the remedy of restoration of security clearances. Mr. Crompley, the scope of remedy question seems at least somewhat distinct from the justiciability question. Yes, Your Honor. Your top-line argument is these determinations, revocations, are just not justiciable under Lee. I take that argument. But if this court were to find that this case was somehow distinguishable from Lee, I'm not sure I see in your brief arguments that the remedy should be narrowed or that the injunction should be narrowed in a particular way. So we did in our original brief, we talked about how the remedy involved was turning back on security clearances and that at a minimum the prohibition on individualized review if it was done pursuant to Section 1. But so do you – but I don't see any fallback position that if the scope of the remedy is too broad, that for instance, you know, the injunction could be narrowed in some way. I believe that we did state that at a minimum the individualized review prohibition is improper and the law firms didn't respond to that particular argument. So I want to talk a little bit. You analogized to the pardon power, and I was thinking about that as well. But this is a little different because there's not a sexually committed prerogative in the President to grant or deny a security clearance. There's a more general national security commander-in-chief authority under Article 2. And so isn't it different in the sense that we have to decide – and this is really following up on the Chief's question – we have to decide whether this is a national security determination or not. And I took the Chief to be suggesting, well, if it isn't, and if the executive agrees that it's not a national security determination, what's the constitutional prerogative, the exercise? Don't we have to police the boundaries of the political question doctrine in a different way than we would with a pardon? No, Your Honor, because Lee v. Garland uses the term textual commitment when it talks about security clearances. It references that as a textual commitment on multiple levels in multiple sections. And when I use the term textual commitment, I'm not creating that on my own. I'm taking that directly from Lee. And then Eden also talks about how it's a constitutional commitment that flows directly from Section 2 of Article 2. There's all kinds of things, even under the commander-in-chief authority, that are subject to constitutional constraints. Yes, Your Honor. They fall squarely within the commander-in-chief authority, but we still apply the 14th Amendment and other constitutional provisions. Yes, Your Honor. In the context of security clearances, Lee says that that's a textual commitment that is off-limits. So that would be our position. Right. What I'm not sure about is that Lee and Egan, they spend quite a bit of time elaborating on the executive order apparatus that attends security clearance determinations in the main. And I'm not aware of another situation, and you can correct me on this, but I'm not aware of another situation in which a security clearance was revoked outside of that apparatus. So, Your Honor, I'm not sure if there was that particular case that was out there. I don't know, but it's just to make the point that that's almost always the rubric when you're dealing with the security clearance determination. And so I take what Lee and Egan start with as a premise is that that's the enterprise that we're dealing with is the normal executive order apparatus that begets a security clearance revocation. And this one is not part of that. That doesn't necessarily mean it can't be the same thing if it fits within the same parameters, but it's at least not part of the same apparatus. And so it doesn't come with the same automatic assumption necessarily that would attend to anything under the executive order. Because I take the lesson of Lee and Egan to be if it's in that zone, you can't look behind it. You just can't because of the zone that it's in. That zone is committed to the executive, and we don't second guess. As long as it's within this zone, we don't second guess it. But I guess the question is that I think we're asking is if you don't have that zone automatically in play anyway, because it doesn't come with those trappings, then you're still saying that it's something that can't be looked at. Yes, Your Honor, two responses or three responses really to that. And I see my time is up, but I will keep going. So first, when you're talking about who gets that authority, it's not the executive agencies that the Constitution commits that question to. It's the president himself. So obviously, the executive orders that bind the agencies to a particular process don't apply to him.  Which is the point, I think, and that makes perfect sense. It's just that we can't assume that it's being governed by the same considerations that apply when the executive orders are in place. So, Your Honor, when you look behind the big picture of what Lee and Egan says, it's because the Constitution commits the question of who accesses classified information. And there was a recent case in the Seventh Circuit called Sheba that talks about how, you know, it treats it a little bit differently than Lee because it treats it as a merits versus jurisdictional. But that doesn't matter. They said once a decision is made, that's final and we can't review it. So that's one other rubric. And then two, when we're talking about national security, the executive order uses the term national interest. So that's obviously going to be broader. And three, there have to still be judicially manageable standards for how to determine, especially in a mixed motives case, how to weigh that. And Congress hasn't circumscribed that authority to provide the judicially manageable standards. I found it striking that in connection with the security clearance is that the orders did use the term national interest, not national security. And I recognize that, of course, national interest encompasses national security, but we have no facial basis to know that that's the part of the national interest that the president was acting to secure by including the revocation of security clearances. So, Your Honor, the word national interest, that have been used in many security clearance executive orders in terms of determining who gets access to classified information, going back to the time of Eisenhower and even under the Obama administration. So the term national interest wasn't something we were just creating to overstate national security. That was just something that's been in the executive orders historically. And that's also another reason why there's no judicially manageable standard, because what is the national interest? And that could be broader than the term national security. And I don't read Lee and Egan as saying that if we don't use the words national security, then, or if it's not something that's tied directly to the definitional term of national security, that all of a sudden it becomes reviewable. That's not what I read Lee and Egan to say. So if an incoming president of, let's say, a Democrat says, I think that any lawyer who represents a Republican, by virtue of that representation, even if the lawyer is him or herself a Democrat, I think that the representation of my enemies is a threat to national security. So any lawyer who represents a Republican is immediately today has their security clearance revoked. So, Your Honor, that back pattern would be the same answer that we have because it's a threshold issue as to whether you can review it or not. And that doesn't mean that there aren't solutions to that problem. One, Congress can pass a statute that says you can't base security clearance revocations on X, Y, or Z. Two, they can impeach a president. The president would be bound by that, notwithstanding his constitutionally committed Article II authority. So, Your Honor, because one of the key reasons in the political question doctrine that Lee held that it's exclusively committed is because Congress hasn't tried to circumscribe it in the past hundred years. So your answer would be that in that instance, Congress could so constrain a unilateral presidential determination that any lawyer, regardless of party affiliation, who represents a client who is not of that president's party, that Congress could say, your Article II power doesn't reach them. So, Your Honor. They would have to follow that. Yes, Your Honor. So both Congress and the president have authority over the military and if they wanted to, over the security clearance apparatus. It's just saying political question can mean either just the executive or just the executive in Congress, but it just means that the courts themselves cannot be. So it's not the pardon power then? It's not in that sense, but it is unreviewable in the same way, even if the reason is not good enough or even if there's a facially improper reason. Lee treats it as a threshold issue, and it doesn't look, because if you're looking towards the reason or what's on the face, then it no longer becomes a threshold issue. You're looking at the facts of the case to make a determination as to reviewability, and that's not how reviewability works. So when you're talking about political question doctrine, the line that's drawn is when a decision is made, that's when it becomes unreviewable. And at a minimum. Does Congress make it reviewable by statute? It can provide. So one of the reasons that Congress provides criteria with those criteria be judicially reviewable. If Congress said they were potentially because part of the reason why under the political question doctrine, one of the factors is, you know, in addition to the constitutional commitment is whether there are judicially manageable standards. And if Congress provides some judicially manageable standards, then at least the second part of the Baker v. Why are there not judicially manageable standards here where there is well-established case law on what constitutes First Amendment retaliation? So, Your Honor, in terms of. Not a statute, but it is, you know, longstanding precedent. So, Your Honor, in terms of if it's a mixed motive case and you have to peer behind the reasons that the president made the determination, and if it was a good or bad motivation, that alone result is also one of the inquiries that Lee says is off limits. And especially when you have no, no judicially manageable standards at this moment as to how to review it. And Congress hasn't attempted to intrude on that power of the executive. And Lee talks about it as a textual commitment to the executive. Can I ask you a question about the arguments that you're making in this case relative to the arguments that you're making in the case that we're going to hear next? And I think you're familiar with both cases, obviously. So, in the other case, the same threshold argument was made by the government to the effect that it's non justiciable. And then there was a fallback argument under the First Amendment that even if you get past justiciability, this was made for proper and valid reasons. And the proper and valid reasons being, I think, protection of classified information. So, Your Honor, yeah, the president didn't determine that this person shouldn't have access to classified information. Right. So, the argument was made in the next case that even if you get past justiciability, that the government should prevail on the merits because the decision was made for the bona fide reason to protect classified information. That fallback argument wasn't made in the first case, this set of cases. So, Your Honor, we addressed the First Amendment retaliation as it pertains to sections 3 and 5. That also applies to all of the executive order as well in terms of whether they meet the standards for First Amendment retaliation. Right. But the arguments that were being made on the other sections don't have to do with protection of classified information. So, Your Honor. The arguments that were being made there were based on the decision is okay because it was based on an anti-discrimination notion or was based on litigation misconduct or things of that nature. The merits defense isn't one that would ordinarily, it's not the one that was made in the other case. Well, it's a different flavor, but we do believe that if we pass the First Amendment retaliation, it would obviously apply to section 2 as well. Okay, but the argument about protecting classified information wasn't made here. And your answer may be we didn't need to make it, but. Yes, Your Honor. One, we didn't need to make it. And then two, the relief here also went way beyond what was in the court order in Zaid because it ordered the restoration of security clearances and prohibited individualized reviews. So, there's a little bit different flavors of the case, but. I'm sorry. Yeah, so that is my final, that is my answer on that issue. I don't think the government has made an argument about narrowing the injunctions. If, if this panel were to conclude that the government loses on the merits. So, Your Honor, we did make that is forfeitable under our case law. So, Your Honor, we did make the argument I believe in our opening brief that at a minimum, the plaintiffs would have to concede that the lack of individualized review is improper. So, I do believe that we preserved it on that ground. What is that? The lack of individualized review was improper. So, the prohibition of individualized review, if done pursuant to the executive order, there was three district, the district where it's not only ordered restoration of any security clearances, but it immediately ceasing any reviews that were done. There's no argument that, for instance, it was an abuse of discretion to order reinstatement. And so, therefore, fall back position appropriate relief would be declaratory judgment or following procedures or some other more tailored equitable remedy. So, Your Honor, I'm missing something because I don't recall seeing anything of that. So, Your Honor, I do believe that the argument that at a minimum, the individualized review was improper was in there, but I can double check before I come back up on rebuttal. And as a factual matter, am I correct that the executive has not taken steps to under the processes laid out in the governing executive orders to individually consider and revoke security clearances of all the members of the plaintiff's law firm? So, are you talking about, Your Honor, after the injunction or after the injunction?  Yeah, my understanding is that that has not occurred. How can you maintain that the executive orders are concerned with handling of classified information when the president rescinded his order against the Paul Weiss law firm, when the firm aligned itself with his political priorities and offered pro bono services? I'm not aware there was any term in that settlement that had to do with the handling of classified information. So, Your Honor, I do believe that part of the issue with Paul Weiss that was similar to some of the cases is that there was an individual that he believed engaged in improper conduct, Mark Pomerance, while he was in the government. And that was the basis for the Paul Weiss executive order. And then there was also the illegal discrimination provision. All that was part of the order. But whether someone agrees to fix their claims with the president, I don't think that has any bearing on whether he had the authority to issue the executive order here. But it seems like, just to follow up on that, it seems like it would have a bearing, just as an intuitive matter, on whether the determination was grounded in trusting the holding of classified information. Because did the revocation of the executive order, the pullback of the executive order was within a week, right? I'm not sure of the exact timeline. I believe it was seven days, if I'm remembering correctly. I think it was issued on the 14th and then retracted on the 21st. And if that's the case, then I don't take you to be making the argument that it was grounded in a determination that what was once untrustworthy, that how many ever people Paul Weiss has, 1,500, 2,000? I don't know that none of them are eligible for security clearance. But then within the seven day period, there's been a determination that actually all of them are eligible for security clearance because of the considerations that led to the pullback of the executive order on this. So, Your Honor, two answers for that. One, just by asking the questions of what his motives were here and what his motives were there, that is the precise type of question. That's your justiciability argument and point taken. But it doesn't purport to be based on a determination that has to do with whether the individuals, the massive individuals that are encompassed by the order can be trusted to hold classified information. So, Your Honor, if the president believes that whatever issues that were there with the particular, if the president believed that whatever issues were resolved through the agreement, then that is the president's prerogative in the security clearance realm. And doesn't the response to the Paul Weiss acquiescence to term suggest that the government did not, or that the president did not see the order as severable, that one package? No, Your Honor, and I'll get to severability right now since that's also a pretty important part of the case. So, the way that we test severability is to look at the president's intent. In Minnesota, the Millie Lack banned the III Indians. The court concluded in that case that President Taylor intended for the EO to stand or fall as a whole. But in this case, we don't have to look towards or think about or look towards the president's subjective intent. You can look towards what actually happened in these cases. So, for instance, in the beginning, only sections three and five of all the executive orders were enjoined, and sections two and four were allowed to take effect. And then what happened in the Perkins Coie case, section four was implemented through the EEOC letters. And then in two cases involving, I believe it's Jenner and Wilmer, security clearances were suspended. If the president intended for it to stand or fall as a whole, what he would have done is stand down and not taken any actions based on sections two and four. And I think that my colleague on the other side actually conceded that the president was willing to implement whatever order that he was allowed to. And it's in JA 2803 when it talks about the security clearances that were suspended after the preliminary injunction. It states, this development underscores that the executive branch stands ready and willing to implement the executive order passed in judicial intervention. So I do agree that the president would have implemented whatever he was allowed to. So that's why we believe it's favorable and doesn't stand or fall as a whole. So in terms of the question, at least Judge Bates did not enjoin the operation of section one.  But my understanding of the president's theory is that section one is the explanation for the reasons for two through five. Yes. And so if there were an injunction relating to two through five, section one is not severable because it's a purpose for things that would no longer exist. Yes, Your Honor. And our issue with section one is to the extent that one, it does enjoin government speech. And then two, to the extent that there is a permanent injunction based on any motivation, hypothetical or real for any action taken that could be potentially linked to section one. And Judge Bates had a pretty good answer on that one. It states that standing in rightness doctrine don't allow every hypothetical injunction well into the future, especially when you're talking about on a permanent basis. So it goes against standing in rightness doctrine when you're permanently enjoining based on what could be motivated by government speech. I think the argument would be that it's one unit. Sure. And so you're not enjoining section one. If section one had been issued as a standalone threat, then maybe those arguments about rightness would have to be addressed. But here, clearly the actions pursuant to two through five, well, if you assume, let me ask as a hypothetical, if the actions taken to sections two through five were right, and the only reason for section one is as integrated with one or all of those sections, then it is just not severable, and therefore you don't separately ask a rightness question about it if it had been issued. So, Your Honor, my read of the permanent injunction on section one is not just in the future not doing anything substantially similar to sections two through five. It's any potential government action with section one as a motivation. And until we see what that is, we're speculating on that. And that's what goes against standing in rightness doctrine. And in addition, if read broadly, it could be stretched to, you know, say, you can't have section one influence the pardon power for who someone appoints as a political appointee. So that's where we believe that a permanent injunction goes too far. I just want to ask you, go ahead. Oh, no. I had a related question to this. I mean, I guess I'm not sure why preserving section one matters to the government, because this type of government speech could then be restated in any kind of format, a speech, you know, online post, you know, whatever. So why does it matter? I mean, does it matter to preserve section one, or does it matter because the injunction is overbroad? I think those are slightly different. Yes, Your Honor. Our bigger issue is the permanent injunction as to any motivation for section one, because that puts the government in a position where any future action, no matter how disconnected, we would have to explain how it's not connected to section one. So why specifically is an injunction against section one an abuse of discretion, which is the standard that we need to apply? Yes, so the permanent injunction against reliance on section one in any hypothetical scenario, that would be the abuse of discretion on the permanent injunction. Because it's an abuse of discretion. Because it's overbroad. It's overbroad. Yes, Your Honor. And if it's linked to the operative sections, the permanent injunctions of sections two through five take care of that. But if you're going through every hypothetical scenario, because it talks about permanent injunction and any reliance on section one, that's the part that we believe is improper as a permanent injunction. I might have just missed your answer, but I think you said that to the extent that section one is that you have, like, section one has purpose for two, three, four, five. But to the extent that's an integrated whole and would not enjoining or would not uphold an injunction that said any other future purpose that section one might be deployed for. If you took away that last sentence and just said section one is an explanation of the reasons for two, three, four, five, we think it's non-severable to the extent that it's reasons for those actions. Therefore, if we have grounds to invalidate two through five, then we have grounds to invalidate section one. Yes, but as long as there's not a permanent injunction against reliance on section one for any future hypothetical. But it would still be enjoining section one just in so far as it's part of the same order. Yes, it's enjoining it to the extent that it's operative towards sections two through five. So if the president wants to announce this as a press release or even as a standalone proclamation, that wouldn't violate such an injunction. He said many similar things on social media and nobody sued him for it. So that would be enough in your view. Yes, sure. So just to be clear, I take it back on the security clearance. I take it that your position is because of Egan and Lee, that if a president said I don't trust law firms that represent Catholics, law firms that represent African-Americans, law firms that represent Asian-Americans. And so just law firms that represent people in those three groups, they have to give me lists of their clients who are under control by people in those three groups. And we will deny security clearances to any lawyer in those firms. Political question, non-justiciable. So, Your Honor, yes, because it's a threshold question before you even examine any of those facts. And this isn't something that's new. Title VII claims based on security clearances have always been prohibited. I do, though, in the sense that in those situations, the executive branch, I mean, we've been across this terrain. I don't have to make you belabor it. But in those cases, the executive order of processes are used and the plaintiff says, wait, wait, it wasn't because I failed a lie detector test. It's because I'm trans-American. And the court says, no, there's been an invocation of a security related sort of standard security related concern. And we're not going to get into this alternative motive that's claimed. Right. So that's the precedent that we have. But you would extend that and say anything that questions a unilateral presidential proclamation that security clearances are revoked is non-justiciable because that is presumptively because of the nature of the decision. That is a political question. Yes, Your Honor, because the Constitution does commit that decision to the president. And Article II of the Constitution is just as important as the rest of it. I just want to add one layer to what Judge Pillard asked. And I think I already know the answer, but I just want to make sure. It's the same hypothetical, the same three groups. But the way the question was framed is, and I don't trust those groups, if the directive is framed in different terms, that actually I don't distrust their ability to handle classified information. I just don't like them. And I think having a security clearance is just a government benefit like everything else. And I'm just deciding I don't want the government extended to groups that I dislike totally independently of ability to handle classified information. Your answer is the same. So, Your Honor, there would still have to be the issue if the Constitution commits that question. And Lee has said that it is a textual commitment. And so it would have to be applied in every scenario, and it would have to be one of the other constitutional remedies to address that type of abuse of power.  I just have a couple of questions on some of the other issues. Do you dispute that the executive may not initiate an investigation in retaliation for First Amendment protected activity, even if the investigation is otherwise authorized by law, like a supervisory law firm-wide investigation? So, Your Honor, yes, going to Section 4, and I'll be happy to break down our arguments on that. Section 4 is a little bit different than some of the other ones. It doesn't name any law firm in particular to generally applicable provision that applies to large law firms generally. And this is especially true given that the challenge to Section 4 is a facial one. And in practice, the general applicability did bear out. In fact, only two of the four firms even received EEOC letters for voluntary disclosures out of the 20 that got one. And then one of them, WilmerHale, they received their letter 10 days before the WilmerHale executive order even came out. So it's hard to say that that one is linked to the executive order when before any alleged direction was given. So the law firms do agree that if EEOC had an independent basis to investigate them, that the court can't order that stuff. The issue is whether the fact that the president, because he issued a direction that we can just, for lack of a better term, call based on mixed motives, but contain an allegation of discrimination, whether they're prohibited from looking into it at all and independently determining whether it's true, that's the issue that's here. So I take it that the law firms don't agree that if the government had, in the government's view, an independent reason to worry about, let's say that every law firm that has a DEI policy is somehow engaging in racial discrimination. I don't take the firms to be agreeing that EEOC could do a firm-wide sort of audit of the employment practices at that firm. I take them to be saying if there is a complaint of discrimination that under the law that authorizes. So, Your Honor, EEOC can receive tips from anybody and then determine whether to open up a charge and then investigate. Here, none of the EEOC before the executive orders were enjoined did not open up a charge. What they did, if you look at JA 506 and some of the other letters that were involved, in footnote one, it talked about how they gained the idea to issue these letters based on publicly available information about the 20 law firms. So the issue is not so much whether to open an investigation or not. It's whether the EEOC is permitted to even conduct a review that involves looking at publicly available information to determine if it's worth looking into further. That's the issue. I looked at the information that's mentioned in the executive orders, and on my review, there is no reason to believe that any of those allegations create a suspicion that unlawful racial discrimination occurred. What are your best examples of each of the four firms that they actually engage in illegal racial discrimination against employees? So, for example, in the Perkins Coulee lawsuit, it talked about a scholarship program that was given on the basis of race. So things like that, but it doesn't require. Not to employees, I don't think? I don't. I think that was the Sussman prize. Because it wasn't on the basis of race. I believe that if my memory serves me correctly, and I don't have all the information on the case in the northern district. I think it was somewhere in Texas that they were sued on that. I don't believe that. I don't know quite what the basis was that it was dropped, but they were sued. And the issue is not so much. We can hear from the plaintiffs. I think the lawsuit was resolved as soon as the law firm made clear this is not a racially restrictive program. I don't know if the plaintiffs in that case would have agreed with that answer. But the issue is not so much whether you have to demonstrate that it occurred before you even look into it. I have reason to believe there was unlawful racial discrimination. I'm just asking, what is the reason to believe? Because I see references to DEI, which is a very amorphous concept, including plenty of lawful activity. I see reference to this Mansfield policy, which also there's no legal challenges to that policy. It's not a legal policy. So, Your Honor, the issue is when you're determining whether EEOC can even look at publicly available information to see if it's true. That's the issue. They can look at publicly available information, but can they investigate wholesale and employer? So, our position is that they haven't even gotten to the investigative step by the time anything was enjoined. And really, with WilmerHale, they sent that letter out before the executive order was issued. So, it's not even really tied to that executive order. So, EEOC obviously came to decide that before the letter was even – or the executive order, excuse me, was written. So, the question is not so much whether they can open up an investigation. The question is whether they can even review. And if review means what they did here, which is look at publicly available information and then ask for voluntary disclosures, that's the part that got enjoined in the Perkins Coulee case. In terms of the orders instructing contracting agencies to require any government contractor to disclose any business that they do with this firm, So, does that mean that if, I don't know, Staples provides office supplies to any federal agency, that the agency has to ask Staples to also provide office supplies to these law firms? And if you do, you need to tell us, and we're going to stop doing business with you. So, Your Honor – Business with them. So, Your Honor, I'm happy to talk about the freedom of association claim. So, in that one, what the – if there's – that's one reading that the law firms and the district courts have taken of that case. But if you look at Section 3 as a whole, including 3B, the focus is law firms that are subcontract, that are providing services in relation to a government contract. And that part is a commercial business disclosure that's not protected by the First Amendment. And I would point the Court's attention to Full Value Advisors v. SEC 633 F3D 1109 that held speech claims where the government requires disclosures for its own operations. Those are not the type of compelled disclosure claims. So, tell me how you read it. What's the limitation that you impose on this? My limitation would be that if it's limited to those who provide the contractor services on a government contract. And to the extent – Those who – those law firms? Yes. That provide a government contractor – Representation in relation to a government contract. So, if I'm one of these four law firms and I represent Lockheed Martin, then – If you're representing them in relation to a specific contract that they have. And to the extent that the – Then what? Then that disclosure is required. They have to terminate contracts? So, Your Honor, yes, it does say to the maximum extent allowed by law. And that does include a due process provision. So, for instance, the DOJ Executive Order, they have an – This is what I'm not following about this theory because the disclosure part of it may or may not be, you know, as you've described it. That it's within the First Amendment, without the First Amendment. But the First Amendment problem is not the disclosure. The problem is the reason for the disclosure is to penalize the firms. And if the reason for penalizing the firms has to do with the firm's speech, that's the First Amendment problem. It's not the – the disclosure is just a mechanism for executing the scheme that's designed to penalize the speech of the firms. So, Your Honor, yes, and I'm separating the two buckets. So, the compelled disclosure is one element. And if you're tying in retaliation, then I can get to the First Amendment retaliation generally because that's what – Because the First Amendment retaliation claim is if we did engage in First Amendment retaliation, then even otherwise legal conduct would be problematic. So, I'll get to that right now. I'm sorry? I'll get to the First Amendment retaliation right now since I think that might provide an answer to that question. Okay. Why don't you take a minute on that, and then we'll – unless you have further questions. I'd like to hear about the retaliation. Yes, Your Honor. So, we are not arguing that the first two elements of First Amendment retaliation are met in this case. It's really the third element of the but-for causation. And under this circuit's precedent, the test for whether we would have issued the executive order's absence be protected conduct – and I use the word protected very clearly because there is no arbitrary and capricious review for First Amendment retaliation. It either falls into the bucket of protected or unprotected conduct. And there's three different buckets that we have here. One is hiring of those that the President believed engaged in improper conduct as government employees, and that applies to Jenner and Wilmer. And Jenner uses the argument that even if that were the case, that their association with him is protected by freedom of association. That's incorrect because who a law firm hires for a commercial business purpose is not expressive conduct in the same – that receives First Amendment protection. So, in Scahill v. District of Columbia, 990F3E at 1185, it states that commercial association claims, which include hiring, are foreclosed as freedom of association claims. So, if the law firms are hiring, say, Robert Mueller or Andrew Wiseman, as a commercial association, that conduct is not protected. And if that was the motivating factor behind the executive orders, then the First Amendment retaliation claim has to fail. Is that true of partnerships? So, Your Honor, I would point the court to the Heshaun v. King and Spalding case. It treated partnerships as similar for hiring purposes. And although it's geared towards discrimination, the big picture is that law firms are treated no differently than anybody else when it comes to who they're hiring. A lot of employment law depends on who you hire not being expressive conduct protected by the First Amendment. And to hold otherwise would have some extreme second – Associational conduct, I think. It's a commercial associational conduct. That's the issue. So, this district, or this circuit, excuse me, has foreclosed freedom of association claims on commercial associations because that's not the type of expressive conduct that the First Amendment protects. And that was in the Scahill v. District of Columbia case, 909F3E at 1185. And to the extent that – and to hold otherwise would have some pretty extreme second- and third-order effects. It would mean that, for example, if a law firm in its hiring said, I'm only going to hire, say, Republicans or Democrats, and that's because we want to send this message or, like, you know, we only believe that this type of political view is morally correct, and that's our expression, then a D.C. law that prohibits political discrimination in hiring would be de facto unconstitutional. So, it would have some broad second- and third-order effects if we make commercial association all of a sudden protected conduct. And nor is Wilmer correct that the president retaliated against them for their views on Robert Mueller. The Rumsfeld v. Fair case talks about how just because something – just because you talk about something that's otherwise not expressive conduct does not all of a sudden make it protected. And the issue is whether the president would have issued the executive order absent the hiring of Robert Mueller and the DEI. And I think given that for Jenner and Wilmer, a lot of the focus was on hiring those individuals. And, again, the issue is not whether that was a right decision or a wrong decision or whether that was an arbitrary decision. The issue is whether that conduct is protected or not. And if it falls outside the bucket of protected, then the First Amendment retaliation claim would fail. And the other thing I would point out is there's litigation misconduct that's also not protected. That applies to the Perkins one. And there's discrimination based on – keep in mind, with the District of Columbia, the test for causation is a subjective one. And that's in 796F3DF107. So, would the president have subjectively, say, issued the executive order on the anti-discrimination grounds, which apply to all four of them? And the type of showing for whether something would have otherwise been done in a First Amendment conduct is highlighted by TikTok v. Garland. Because there, there was both a foreign content manipulation and data collection justification on why Congress passed a law that forced a register of foreign-controlled social media apps. And even though the content manipulation piece was by far the larger focus of the statute, the Supreme Court held that the data collection provision was sufficient even though the law focused on social media platform content exclusively and failed to regulate most Chinese e-commerce conglomerates that also engaged in that. So, just so I'm understanding where we are on the argument. The point being made here is that what you're describing as unprotected, the president would have made the same decision solely based on that. That's where we are on the argument? Yes. I just wanted to make sure I understood. And if it is, then that's not protected conduct. And then this also especially applies to Section 4. So, for instance, in FTC v. Media Matters, obviously, it's an unpublished case that's not binding on the court. But one of the ways that it's held that the government didn't argue before causation in that case, but it's used as an example of one way that it could have met that. And that was the fact that in addition to Media Matters, a multitude of other entities got similar CID requests. The court didn't know how broad they were in their sweep or how broad they were in their scope. Here, you do have 19 other law firms that, I mean, excuse me, 18 other law firms outside of the ones here that also received a similar letter. And you do have all of the letters in the record, and they are identical in their sweep. So, that's another reason. So, we do believe that if it falls outside the bucket, it's unprotected, even if it's not – even if the court disagrees that that was a good reason, if the president subjectively would have done it absent those protected reasons. Let me make sure my colleagues don't have additional questions. Just a reminder, your statutory authorization for the EEOC without a specific complaint to do an employer-wide audit is not separate from just the ability to follow up on a tip. Yes, Your Honor. So, this – what they were was a request for voluntary disclosures that the law firms could either say yes or no to. There was no compulsory aspect to it, and some law firms provided information, some declined, some settled. So, if they said no, then the EEOC would just have to use what it has to decide whether or not to open a charge that would lead to an investigation. No further authority beyond that. So, Your Honor, I do believe that the EEOC is authorized to ask for voluntary disclosures before deciding whether or not to open up a charge. Thank you, Mr. Hawley. We'll give you some time for rebuttal. Good morning, Your Honors, and may it please the court. The executive orders here strike at the heart of the First Amendment and the ability of lawyers to zealously represent their clients. The four law firms here were not singled out because they had unusual hiring practices or demonstrated problems handling classified materials. Instead, they were singled out because they represented clients or associated with attorneys who raised the President's hire. That is not conjecture. While most cases alleging retaliation depend on either speculation or extensive discovery, here the executive orders laid the President's motives bare. The executive orders inflict a wide array of punishments on the law firms because of the clients the law firms represented and the lawyers they associated with. The executive orders run afoul of the better part of the Bill of Rights. In identifying the order's constitutional defects, it's hard not to start with the First Amendment, but it would be a mistake to end there. The retaliation and viewpoint discrimination that pervaded the executive orders would be obviously unconstitutional if directed to any speaker, as the Supreme Court unanimously reaffirmed in VULA. But the fact that the retaliation is directed at law firms based on the clients and causes they represented, often successfully, poses distinct risk to the right to counsel, separation of powers, and the rule of law. As the Supreme Court made clear in the Velazquez decision, an independent judiciary depends on an independent bar that is not forced to compromise zealous representation of one client out of the fear that it will anger the powers that be and make representing another client more difficult or even impossible. Lawyers cannot zealously represent their clients while walking on eggshells for fear of reprisals. Thus, the executive orders strike at the heart of the rule of law and the zealous representation on which the judiciary and the adversary process depend. Now, I could take – I'm happy to take a question. I was going to take as a point of departure my friend's effort to say that the security clearance process is like the pardon power. That's – I want to start with the security clearance process. Just so – so what's your answer to the government's reliance on Lee and Egan? And in particular, if we have a case that just involves security clearances, suppose we have the same executive orders, but the only consequence – it doesn't have a section 2, 3, 4, and 5 because it only has a section 2 and only 2A actually, so it's only about security clearances. Would your answer vis-à-vis Lee and Egan change in that context? And if not, why not? Well, I mean, would it be modified? Yes. But would it change fundamentally? No.  I mean, and I guess I want to make sure I have the hypo. If it's section 1 and section 2 but not 3 through 5, it's a pretty straightforward case because then what you have is a deviation from the ordinary procedures, what I think in the general brief they call it a bespoke procedure just for this law firm based on the findings in section 1. And I think that becomes a straightforward case where it is justiciable. It's on the Greenberg side of the line from Lee, and Lee left Greenberg undisturbed. And so I think there's kind of two categories that both happen to be here that make this a relatively straightforward case for justiciability. One is that there's a procedural aspect to the challenge, and the other is that what you have here is not an individualized discretionary determination of the kind that was issued in Lee, but you have this kind of policy that's external to the ordinary process that I think is consistent with the way you were framing some of the questions, which is we have this elaborate 13-factor inquiry to determine whether an individual is supposed to be trusted with security information. And then we have a policy that comes in on top of it and says kind of never mind the 13 factors. An entire group of people are going to be suspended or have their security clearance. So on that, so if it's about individualized, which at least part of that is individualized, it seems to me that you could have a group-based determination that's grounded in all the right considerations, and it would still be perfectly fine as a clearance matter. I mean, you could have an entire organization whose dedicated purpose is to overthrow the government of the United States, and everybody who's a part of that organization could be validly denied a security clearance, including based on their speech. That would be okay. It's non-individualized. It's grounded in speech, but it's also grounded in the considerations that normally attend the security clearance enterprise, which is can they be trusted with the classified information. So the individualized part of it, it doesn't necessarily leap out to me as itself salient. It's the substantive reason that the security clearance is being denied. Is it bound up in what we normally associate with security clearance, or is there reason to think this actually falls outside of that? And that's why the justiciability construct that Lee and Egan operate on might be inapplicable. So, Your Honor, I don't want to fight you too much on it in the sense that I think I win the case on part of what you've put to one side, but I don't want to sort of give up the principle that I do think group determinations are different. And, I mean, you said okay, and I don't dispute that there are plenty of group characterizations that are okay, but I think they're actually justiciable. I think you get over the justiciability hump, and then you have to address it. So you think as long as it's, and I acknowledge that you're not resting everything on this, but you think that any time there's a security clearance determination that involves more than one person, then Lee's inapplicable? I mean, sure, I'll say yes, I agree with that. And I guess what I would say is I think particularly, you know, if you imagine the President says, look, I don't think anybody who is an Asian American is trustworthy. I think that would be justiciable, even though, you know, it's directed to something that's relevant to at least one of the 13 factors. And I think, I dare say, that I would win that challenge, not that it would be justiciable and on the merits, it would be invalid. Conversely, if he says, look, every member of a particular party is, you know, off limits, and then you look in the merits, and it turns out the members of that party are all committed as a matter of party policy to overthrowing the government, then that's permissible. So I would draw that distinction. How is that consistent with Lee, which says that all of this is textually committed to the executive branch? I mean, where does the group distinction make this not a political question? So I guess it depends on what you think is all of this in Lee. I read Lee, and what I think is a textual commitment is two things. One, national security determination. It's not the clearance process generally, and indeed, Lee says as much. It says it's not saying that the security clearance process generally is like the pardon power and is off limits. So part of it is, I think, that all of this is not sort of procedures and things like that. But I also took the decision to be very focused on the textual commitment actually is the individualized predictive judgment that a particular person is not trustworthy. And on that, we take absolutely – I mean, that makes sense. But I think that is – Lee takes it all the way back to Marburg and the distinctions between discretionary judgments, which are political questions, and ministerial judgments, which are not. And if you have some policy, like no Asian Americans need apply or no African Americans need apply, that policy is – it becomes a ministerial act to apply that policy. So your description of what would happen if there was a policy like that, you're saying the next step would be it would be justiciable, and then the court would look at are all Asian Americans or all members of a certain group trustworthy. And that's precisely the kind of decision that Lee says is not open for courts to examine. So I disagree. I don't think Lee goes that far, and I hope Lee doesn't go that far. Because I do think that there's a robust jurisprudence that says that a categorical rule that says that people of a certain race need not apply for even a government benefit that's otherwise discretionary. I think that would be unconstitutional. We don't have to agree with that. Wasn't there an equal protection argument in Lee itself? There was an equal protection argument in Lee itself, right? I mean, there was an argument that it was based on race. Yes. And it was still deemed to be non-justiciable, even though that would be the kind of policy that you're saying makes it justiciable. I would say that, you know, and I think if you think about the Supreme Court's Lozman decision in 2018, there were a couple of Lozman decisions, but the 2018 decision, they draw a distinction between a policy that is retaliatory and somebody who in an individual case says, I was retaliated against. And even though they have probable cause, I want to say that it really wasn't the probable cause. And they drew that sort of policy based distinction versus individualized distinction. I think the same thing would apply in the security clearance context. And I think if it doesn't, then you're opening the door for a president to say that I just don't think Democrats are trustworthy or law firms that represent Democrats are trustworthy. And I don't think you want to open that door. And I'm quite sure that we didn't open that door. Mr. Clark, I mean, what if the president says no security clearances for people who have expressed support for state sponsors of terrorism? You know, Hezbollah, Hamas, something like that. That's justiciable? Sure. I think, would you agree that the president could make that type of group determination that those people are untrustworthy? Absolutely. I hope he does, frankly. But I still think it's a different case from Lee. But then if that case is justiciable, then I mean, I guess if the president can make those kinds of viewpoint distinctions, why can't he make other distinctions that maybe, you know, you or this panel would find less, you know, savory or appropriate? So I think at that policy level, this court has a lot of tools to say that some viewpoint discrimination in the unique context of national security is okay. But to take something that really has nothing to do with the security factors, but just because the president says it does. That's precisely what Lee takes off limits. Lee says that we cannot look behind those decisions. So a court cannot determine whether it's okay to discriminate against supporters of Hezbollah, but not okay to discriminate against, you know, I don't know, various partisan supporters. I don't read Lee to go that far. I mean, again, I know Lee doesn't go so far as to take out procedural challenges because Greenberg is still the law of the circuit. I think you can think of this as being a procedure of challenge. I don't want to make this case harder to win than it needs to be. But for my honest answer, I do not think Lee put off limits, these kind of categorical rules. And I think all the hard hypos that you asked my friend on the other side, and my friend, to his credit, didn't blink, but that's what it means to say that Lee goes that far. And Lee didn't go that far. The hypos, there's still the additional layer about whether it's grounded in a trust determination at all. I agree, Your Honor. And, you know, I saw you modify Judge Pillard's hypo, and I think both those hypos he answered the same way. If you want to draw the distinction between the two hypos, I think that's fine. My clients are going to win this case. If you want my honest answer as to where the line is and should be, I'm sort of with Judge Pillard, which is it doesn't matter if you take a categorical rule and says, all right, I'm going to apply race to – I'm just categorically not going to trust a whole group of people based on something that would otherwise be – Yeah, I mean, I certainly understand the force of the submission, and I wouldn't attribute a view to a question – a judge's view to a question that's being asked, obviously. But we're just teasing out the line drawing. And on the line drawing, it does seem to me that there's a difference between even an ill-gotten trust determination and a determination that's not grounded in trust in the first place. A thousand percent to see the distinction. I'm telling you my answer's the same to both.  But I'm saying I think I would win this case if it's external to a trust-based decision, because these executive orders are not grounded in a trust-based decision. So I hope you have my answer. Yeah, I do. Which is even if you try to do that group-based and say I don't trust anybody who's a Catholic, I still think that's judicially reviewable. What's your – I want to ask – I want to get your read on what's the best indications that this is not grounded in a trust determination to begin with. And then I want to – subject to what my colleagues want to do – ask about the procedural part of it, because I think that's distinct because this is still substantive. This is just substantive on the axis of whether it's grounded in a trust determination or not. Right. And what I would say is there are, under the long-existing rules that govern security clearance determinations, there's some 13 factors that are taken into account. In the record, there's the Leonard Declaration that goes through this and tells you what – so none of those 13 factors are representing political opponents or bringing lawsuits against the administration. So I think you can look to those 13 factors as being a proxy for kind of trust-based decision-making. And the motivating factors, as articulated in Section 1, appear nowhere in there. And then you also, I think, in sort of judging whether these are trust-based factors, I mean, I think you can take sort of notice of what a complete deviation from the normal course this is. And just to put this in concrete terms, one Perkins Coie lawyer on February 12, 2025, was granted a security clearance based on this individualized, exhaustive process to consider all of its 13 factors. So three weeks later, it's taken away and it's suspended and not based on an individualized consideration, and then it's suspended for every member of the law firm, paralegals, people who are about to go serve as military reserve officers and have a security clearance only for that. And there's no precedent for that. I mean, my friend said maybe I'll look for it and come up on rebuttal, but he's not going to find it. There's nothing like this. And so we have essentially unbroken, since at least World War II, this process for security clearances. And then we have this complete deviation based on factors that kind of don't even appear in kind of the normal process. And then, of course, that's also buttressed by the Paul Weiss experience, which we can talk about. And just to put a fine point on this part of it, then could bracket the question about trust determinations that are dubious and rely on even considerations that, at least in other contexts, would not be constitutionally permissible. Could bracket that question and then ground it in the lack of a trust determination to begin with is at least one rubric that's available in your view. I'm happy to bracket it again. I'm not trying to make my hill any steeper, but I was trying to give you what I think is the best answer. I think one way the government might respond to this, and obviously we'll hear from them, is we don't actually know whether the president did the 13 factors in his head. And we can't know. And yet the process on its face, what we know about it, deviates from Greenberg, but Greenberg is delegating authority to people within the executive branch. And here we have the president himself making a determination that he is deemed to be the person who's the final arbiter of that. And Greenberg wasn't dealing with denials. It was dealing with upfront questionnaire. So there's a very different kind of posture here. How do we deal with that if that's indeed the government's position? Well, I mean, I think it's a little hard for that to be the government's position in the following sense, which is one of the things that's striking, and a couple of your honors alluded to this. I mean, as I read the government's brief, there is no sort of merits defense of these suspensions of security clearances whatsoever in their brief. So they, on section two, they put all the eggs in the basket of just disability. So, you know, I don't think they're well positioned to come up here and say, yeah, actually, you know, the president works more quickly than the rest of us. And so he was able to factor into account all 13 factors in suspending all of these security clearances. And another reason they can't do it is just kind of facially, that's not what these executive orders even purport to do, because they instantaneously suspend these organization-wide security clearances. But then they say, but then we'll have like a individualized process in order to restore them. And that is, in a sense, the bespoke process that is a complete deviation from the existing processes. And I think that's another way, if you want to bracket hard questions for another day, I think you could say this is actually much more on the procedural side of the line than the substantive side of the line. I mean, I'm just looking back at Lee, which says throughout the opinion that any challenge to a revocation decision is not justiciable, not for reasons of race, not for reasons of procedure. And any, you know, any harm that's alleged from the revocation decision itself, courts can't review it. So the law firms on the security clearance part of the executive order, at least, are challenging the revocation or, I mean, actually suspension of security clearances. So you just run smack into Lee, unless we're just going to ignore a precedent that's only two years old. I don't want you to ignore Lee. I mean, I think you, I do want you to distinguish. The bespoke policy or trust determinations, none of that is in Lee. You know, Lee doesn't say, oh, you can look behind a revocation to see if it's really about trust or really if they follow the policy. It doesn't say any of that. It says revocation decisions are not reviewable by courts. And three things. One is, Lee says all of that in the context of individualized revocation decisions. And as to individualized revocation decisions, considering the 13 factors and all of the rest, totally agree with it. It also says two things that are. I mean, this is also I mean, this is just a series of revocations. I don't think it is. I think it is a suspension of everybody organizational wide. I don't think there is any precedent for that. And the two other things that Lee says that I think are important is, one, it says that Greenberg is still good circuit law. So we can figure out exactly what the contours are, but it involved a revocation decision. It involved, as Judge Pillard said, an upstream procedural gathering of information for a security clearance. Yeah, I mean, and on that point alone, it seems to me that the logic of Greenberg suggests that if there were on the merits of problem with collecting that data, that there would be a problem if you revoke somebody's security clearance only on the basis and only on the basis of one of the things that you were forbidden from gathering in the first place. Otherwise, it really doesn't make a lot of sense to me. But the second thing I would say is I don't think this case is a thousand percent on all fours with Greenberg, but I don't think it's a thousand percent on all fours with Lee either. And this isn't an individualized decision to revoke or even suspend. And the other thing that I want to point out that Lee says is I read Lee as saying, look, we're not saying that security clearances are like pardons and like the whole thing. Anything that touches security clearance is off limits. And I read Lee and it goes through the two factors on Baker v. Carr. It goes through textual commitment and it goes through lack of judicially manageable standards. Now, taking those in turn, like what is textually committed? I don't read Lee as saying anything that has anything to do with security clearances is textually committed. I think I read it to say that it's the national security determination that is textually committed. And then with respect to the second piece of it, judicially manageable standards. If Lee really stood for the proposition that everything here, as long as it results in a suspension or revocation, is forever non-justiciable. I don't know why it would have bothered looking at the textual commitment piece. And one of the big lessons from the Supreme Court's decisions on political question is sometimes like the theory that's being advanced matters. I mean, look, for 50 years, people thought redistricting was a political question. And then somebody came in and said, well, what about equal protection? One person, one vote. That's a judicially manageable standard. And this gets what my friend sort of gives up the game, I think. When he says, well, if Congress passed the statute, that would give you some judicially manageable standards. But it's a weird world where Congress can give you judicially manageable standards, but the framers can't. The Constitution itself can't. And so that's why I sort of stick by my answer. The president wants to say, yeah, never mind the 13 factors. I'm going to deny and revoke security clearances from everybody of a particular race. I hope that's judicially manageable. Let me ask you about the remedy then here. So if the real problem is they didn't go through the procedures and the EOs and other regulations and things like that, then why isn't the proper remedy to say you have to put everybody through that process? I mean, I'm not aware of any case, and I don't think the law firms cite any case, where a district court has ordered the security clearance to be restored to somebody that the executive branch withdrew it from. And how is that consistent with the remedial authority of the Article 3 courts, that remedy for this problem? So I think what this remedy is perfectly consistent with the Article 3 limits. I'll preface it by saying – You can reinstate revoked security clearances. I don't think that's what these remedial orders do, which is part of my answer. But before I get there, can I just put on the table, I read the government's case the way that was at least the implicit premise of some of your questions to my friend, which is I don't see this sort of separate argument in their briefs that, like, even if it's justiciable, then we go on to argue that this is an abuse of discretion and equitable discretion. I don't see that argument there. Could you still respond? Yes, absolutely. So the way I read these orders is they essentially do two things. One is they invalidate the executive order to the extent that it suspends these clearances. So in that sense, it doesn't order the override or countermand a revocation decision. It simply suspends a suspension. And – I mean, that's just – No, no, no, no. That means people have security clearances. Do the members of these law firms still have their clearances under the injunction? Absolutely. And that gets me to the second part, though. The injunction still preserves the ability to revoke those based on the ordinary process and the 13 factors. That's preserved in these injunctions, and that's what makes it different from a case where you would say, okay, the executive says this person, based on the 13 factors, this person doesn't have a security clearance. So after today's argument, they were to announce, we've gone through the 13 factors, and we revoke all of these for national security reasons. Is that a violation of the injunction? So I think I would be able to go back to the district courts and argue that if everybody who is subject to these orders magically flunks the 13 factors, I think I can show that this is pretextual or a violation of the injunction. Then we have district courts monitoring revocation decisions in perpetuity. I mean, what if it happened after a month? After a month, they announce, okay, these security clearances are revoked for national security reasons. Does that violate the – I mean, this is a real remedial concern because there's an injunction. Are people in contempt? I mean, what exactly is the consequence? I mean, how long does the monitoring go on? I think all of those are questions that are open to the equitable discretion of the district court in trying to adjudicate. I mean, we're only at this point in the argument if there's an adjudicated constitutional violation. And at that point, I do think there is some remedial discretion. And I do think, look, there's going to be two radically different cases. I mean, if one member of these law firms happens to get their security clearance revoked based on the application of the 13 factors, I don't think anybody's going to try to go back to court and do anything about that one lawyer. If it turns out that everybody at all of these law firms and, frankly, nobody else in a six-month period has their security clearances revoked, I think that would be a colorful – The court does not require a court to figure out what the motive was and look behind the revocation decision, all of which is barred by Lee. I just want a clarification maybe from you. I'm sorry. This is a little procedurally odd. But are you saying the president would say I've done the 13 factors or that the process that the executive orders contemplate, which includes giving reasons, some amount of rebuttal by the applicant and some appeal, does it matter to you? I mean, I guess either – I mean, you know, following the process, whatever the process requires. I mean, the process also seems to contemplate that, you know, I think cabinet secretaries and certain people have the authority to not follow those processes, right? There is some – there's sort of some safety valves from the process. You could take the question under either route, I guess. Yeah. I mean, I think either way, I think there is a role for the judge in that situation to not to second-guess any security decision, but to say, you know, is my remedial order being flouted and is this just a continuation of what I tried to enjoin? And I think that that is a perfectly permissible exercise of remedial discretion. But the key thing is it follows an adjudication of a constitutional violation, and then there's a judicial remedy. And at that point, there is some discretion. And then I'll just go back to my first point, which is to say, and I don't think my friends have even preserved this kind of merits-based argument. I think with respect to Section 2, they have very pointedly put every – all their eggs in the basket of just disability. And I think they did that for a very good reason. I mean, it goes back to the question about is this trust-based, is this something that you could, you know, really even sort of characterize as being just a quick application of the normal factors. If that were the case, they have a merits defense. In most cases, I've seen the government, when they make a disability argument, even in the national security context, they follow it up with a merits-based defense. And the absence of that here, I think, is telling. And the other thing I'd just say about sort of locating Lee within sort of circuit precedent, you know, there are all sorts of contexts where this court defers to the executive about national security, maybe makes the determination that the final decision about how the national security is weighed is subject to political question or the like, but nonetheless provides a degree of judicial review. I mean, the Rawls Court case is a perfect example. Like security clearances are awesome, but so are ultimate CFIUS determinations about foreign investment in this country. So for Rawls, I mean, you know that case, obviously. And do you see a distinction just on the basis that Rawls didn't involve a security clearance? Because Rawls also involved the political question doctrine and specifically decided that the political question doctrine didn't stand in the way of finding a procedural due process problem. Right. And is there a basis for distinguishing it, though? Now we're outside the First Amendment. Now we're on procedural due process as another basis. But on procedural due process grounds, I think the government's response on Rawls is, look, it says what it says, but that doesn't stand in the way of Lee because Lee didn't cite Rawls. It doesn't specifically deal with Rawls. There's the political question overlay that is in play in both cases. But one's a security clearance case and the other is not. I mean, I get that. But, you know, the for the for the decision on the political question as to the individualized substantive determination, the the Lee against Garland cites PMOI, which is kind of in the same general bailiwick as Rawls. Slightly different, but same general bailiwick. And what I would say is that's just. And of course, Lee v. Garland is also distinguishing this court's decision in Greenberg. So you put all that together and it seems to me that, like, the political question isn't like CFIUS process. The political question isn't the security clearance process. There is a political question. I would define the political question as being the individualized predictive judgment, which is at the bottom of the case in Lee. And that's why I think policies are different. Procedures are different. Predictive judgment about protection of classified information based on that individual. And that is the classic. See, I think like, you know, I think Lee, it's a great decision. It goes all the way back to Marbury. It says there's a huge difference between sort of ministerial decisions, applications of policies and discretionary judgment. And what it ultimately says is the discretionary judgment that is the political question is the individualized determination that this person poses a threat to the national security. And about Lee, one other question about Lee just so I don't lose it, and I think it was raised earlier, but I just want to make sure I understand your thought about this. So Greenberg is discussed, specifically discussed in Lee. And one of the distinctions that Lee specifically says about Greenberg is not just that it's upstream because it is upstream, but also that it's upstream in a way that doesn't intersect with whether the security clearance is granted or not, because it has to do with the privacy considerations that are independent of a grant or denial. And the government says here that that's why Greenberg doesn't apply here, because Lee already told us why it doesn't apply. That didn't have anything to do with whether the security clearance was granted or not, whereas this claim that the law firms are making here today does have something to do with whether the security clearance is granted. Well, and I guess what I would say is I think you can I can take that distinction and say there are still injuries here that really are independent of the denial or grant or the security clearance. And this really goes back to the broader context here and the fact that this is being done for retaliatory reasons, for punitive reasons. And, you know, if you look at this executive order as a whole, this isn't we started this whole colloquy based on your hypo about what if it was just section one and section two. But that's not this case. I mean, you have section one and then you have all these things. And what you I mean, if you're going to just put your sort of common sense lens on to look at this, what you're going to say is this really wasn't about trust and security at all. This was about maximizing punishment on law firms that had associated with people the president didn't like or represented clients that the president didn't like. Or in some cases, just expressly in the orders, they sued the Trump administration. So that's the justification for all of these various impositions on the law firms. It is as if they looked around and said, all right, law firms don't have that many touch points with the federal government. There's not that many places we could hurt them, but let's hurt them everywhere we can. Let's start with security clearances. Let's go to government contracting and forced disclosures like what effectively amounts to a secondary boycott. As I read section three, let's investigate them and single them out for investigation for their employment practices. Let's bar them from government buildings. Let's not hire their employees into our administration like across the board. And I don't know, I don't see how you ignore that this isn't like kind of any other security clearance case that the courts have ever had. And I can't imagine because it's not a security clearance order because it's an order that has to do with a bunch of stuff. And one aspect of which is a security clearance, but you take it as a coherent whole. Right. And the coherent whole has nothing to do with the trust considerations. There's nothing to do with the 13 factors. And just to get back to answering your specific question about Greenberg, it's that which inflicts an injury that's really independent of the grain or denial of any particular security clearance. If unbeknownst to the world, three Wilmer Hale lawyers lost their security clearance like there's no chilling effect. There's no sort of, you know, Paul Weiss doesn't come in and offer 40 million dollars in legal services. None of these things that actually happen because of the coordinated, unified nature of these executive orders happens. So there's clearly an injury here that's entirely separate from that argument. The injury being separate from the granted security clearance. It seems like your logic for that would apply even if the order only dealt with security clearance. It would. And that's why I tried to ask you from the very beginning. Are we talking about section one and section two? Right. Because if it were just section two, it would be a different case. I'd still be here. On section one, can I ask you about section one? So this came up in the colloquy earlier with, I think, both my colleagues and Mr. Connolly. But if the order, if the relief enjoins section one, but then doesn't say that means that section one can't be used in any context, no matter what in the future. But what it does is it enjoys section one because it's part and parcel of an executive order that's deemed to be invalid. Then that that satisfies your clients. I mean, it satisfies my clients. I mean, I think to the extent that some of these orders go a little bit further, I don't think it's an abuse of equitable discretion for the courts to have done that. And because of the way this case has been litigated. I mean, I don't know that we've sort of flyspecked that. I mean, there's up here representing four firms that are the beneficiaries of four slightly different injunctions. You know, nobody's cross appealed on one of these injunctions to say we need a little bit more. So at just a kind of practical seat of the pants answer, I can say, like, I don't think making like a tweak would really be the end of the world. But at the same time, I don't really see that argument being teed up. And to the extent it is being teed up, I don't actually see an abuse of discretion in any of these orders. And, of course, the great thing about like equitable relief, as opposed to monetary relief, is if the government really thinks there's a problem here at the margin, if they still there's continuing jurisdiction, they could go in. You could say you lose this appeal. But if you know, if you really think that Section one is going to stop the president from exercising his pardon power, his veto power, like have at it, like, you know, bring that and then bring it in front of the judge. She's very familiar with all the facts and circumstances. I mean, you know, if you're going to think about the equitable. That's a follow up question to that. And I mean, you say you don't. I mean, almost a third of your legal argument was about preserving the injunction against Section one, which I guess I didn't entirely understand why that is so important, because assume you win on sections two through five. Why does it matter to preserve the injunction on Section one for the three firms that got an injunction on Section one? I guess I'm not sure why that's so such an important part of the legal argument here. I think it's a pretty important part of the legal argument, because I think Section one is essentially the retaliatory glue that holds all of this together. And I think there's a real concern in this case that, like, given what happened and given the sort of retaliation, the way to remedy it is to try to wipe out these retaliatory orders to the maximum degree possible and not save the retaliatory intent, which in some respects is the core problem here. And I guess I was going to say that considering, like, the discretion of these judges and the equitable discretion, like, I think those are arguments that would be better addressed to these judges because they've sort of lived through this. And one of the things they've lived through, and this is. I mean, who will suggest there is permissible government speech on one side, right? The government can speak that, you know, a president can say whatever he wants to about private companies or other actors in our society. And on the other side, there's the use of state power in a way that's retaliatory. So why is it section one justice government speech? Because it's in an executive order. And I think if you actually look at the structure of these executive orders, it provides the answer, which is section one, just like section two through six follows the phrase in the colon. It is ordered. So section one is part of the order from the president of the United States that would be binding on the entire executive branch. And so, I mean, you know, look, if like maybe it's like a slightly harder case, if it's just like a free floating preamble. But it's part of what is ordered in this case. And if you accept that two through five are retaliatory, then the question for the district court judges is how do we try to unring a bell? And I think in making that decision, there's no perfect way. There's no perfect way to put everybody back in the same position. I mean, you know, frankly, I mean, even today, if somebody really wants a favor out of an executive branch agency, and they're trying to pick between one of these four law firms and a law firm that's given $100 million in pro bono service to the executive branch, I think a lot of clients at that margin are going to go with the firm that gave $100 million in free legal services. And so, you know, from the perspective of the judges who are trying to unring this bell to the extent that's possible, I think invalidating the whole order and enjoining section one is important. And I think that's particularly true because, you know, I'll try to get this out because I've tried three times. But these are – they've lived through this. And if you look at Joint Appendix 2057, that's the compliance order that went around from Attorney General Bondi and Mr. Vogt to the executive branch after these TROs were written. And that is like no other compliance order in, I think, the history of the Justice Department, where it basically says these unelected judges are at it again. The Supreme Court should do something about this. And you can still sort of do what you want, but here's the text of the TRO. When a district court judge lives through something like that, I think they are entitled to go a little bit further at the equitable discretionary margin to unring the bell than they would be in a case where it's obvious that the government is trying to maximize their compliance with the TROs and the interim orders. Can I ask a follow-up to that? So if – so if, you know, if the law firms prevail in this litigation, could – what happens if the Department of Justice decides to investigate what it considers racial discrimination at a series of law firms? Right? Unconnected to the EO. Back before the district court saying that that violates the injunction on Section 1. I guess my concern is that an injunction on Section 1 covers a broad range of discretionary actions that are almost unquestionably lawful. Enforcement discretion unconnected to any retaliatory intent. So I guess what I would say is it depends what the series of law firms looks like. I mean, you know, there's – no, seriously, because there's 360 law firms that have the Mansfield Rule or adopted the Mansfield Rule. If the government goes after all 360, I don't think I'm going to have a basis to say that the injunction has anything to do with it. If they go after 10 firms and it happens to be one of these four and nine others that have nothing to do with it, I don't think I'm going to have any basis to go back to a district court. If they pick out five firms and it's these four and one other firm, even though all 360 have the same policy, I think I'm going to have a pretty good basis to go back to the district court. So I think the answer is it really does depend. And, like, I understand the impulse that this seems like kind of like a broad kind of relief, but Section 1 was addressed to the entire executive branch. And so I do think in that sense it makes some sense in trying to remedy that. If you have already found it to be violative, and violative largely based on the retaliatory intent expressed in Section 1, it would only make sense to say we're going to enjoin that as to the entire executive branch. So you're suggesting that the remedial relief matches the scope of the executive order, and so it's appropriate. Exactly. Exactly. And I will be the first to say I think, you know, that remedial discretion after finding an adjudicated constitutional violation is one of the places where the district courts do have a lot of discretion. And it's part of the reason, like, we're not here cross-appealing on the order in the Jenner case, even though it's somewhat narrower, I think, properly understood than the relief in the other three cases. I think district courts have a lot of discretion on that. I just don't see any abuse of discretion here. And as you say, the relief here does sort of follow the scope of the executive order. I wonder if you have any response to Mr. Convey's argument that business has no associational rights with respect to who it employs. So, yeah, I mean, I do have a response to that. And I do think, you know, I think as in most contexts, the right way to think about it would be there be maybe reduced rights. The same way, you know, we have what's left of the commercial speech doctrine that gives a little less protection to commercial speech and other forms of speech. And then there's the particular question, like, even in the context of commercial speech or rather commercial association, I think if the motivation for the singling out is something that is expressive. So I'm going after you because I don't like the political views of the people you're associating with. The idea that that's like rational basis review. I mean, I don't think that the case law would support that proposition. And certainly the Hisham case from the Supreme Court about sex discrimination doesn't remotely go so far as to say, OK, so the government can start saying we're going to essentially punish partnerships because of include Democrats or Republicans in the partnership. We I know various of the of the firms in their in their materials mentioned how many members of the firm have security clearance. Do we have a ballpark number of how all for how many people have clearance? I mean, like, you know, I can't give you like four numbers, but I can say, you know, it's it's you know, it's something in the neighborhood of like 20 at Wilmer Hale. And I guess what I would say is, you know, it's a little maybe a little higher at Wilmer Hale because they have a national security practice as such. But I think at all the firms, if you look at the numbers, what's important here is kind of the breakdown is you've got a handful of people that have it because they do national security work. You've got a couple of people, maybe not the largest group, but in some respects, I think the most important group. And that would be the people that have security clearances in order to provide an ongoing representation where they need the security clearance to, say, represent a criminal defendant. And then there's a group that are basically military reservists. And at least based on the colloquy in the Wilmer Hale District Court proceedings, I don't think in real time the government even knew they were doing that. I don't think that was really their intent, but they swept so broadly. And that's kind of what happens when you deviate from the normal procedures is you end up having radically over broad solutions. And then how many of them are have this clearance because they're military reservists across the four firms? We don't know. It's probably a dozen across the firms. It's kind of my that's my best guess. That's nothing more than my best guess, but to try to give you a kind of sense of the proportions. And I would say that's yet one more distinction, if I may, of Levy Garland. And I think it's something to keep in mind, which is both Egan and Levy Garland are cases where it's an executive branch employee who's losing the security clearance. And indeed, Egan specifically talks about that, talks about the discretion the executive branch has in determining who's going to work in the executive branch in the first place. And I think there are distinct concerns when the person who loses their security clearance is somebody who is outside the government and has the security clearance, particularly if they have security clearance so they can supply counsel to somebody who's adverse to the government. I mean, if anybody's talking to like Al Qaeda, they should lose their security clearance unless they're talking to an Al Qaeda defendant in an ongoing criminal prosecution. And that's another way in which like the 13 factor test can make those nuances. But if you deviate from that and just have this kind of blunderbuss approach, you end up spending the security clearance of people who have them essentially for the best of reasons. And I think that is particularly problematic because it's not just, OK, somebody's going to lose their job, which is bad enough. But it's also going to directly affect the right to counsel, the separation of powers and all of the rest. And it's not just the people who are in the firms who will lose the security clearance that's already there. It's all the people who can never get the security clearance for a future representation. So it's 2000 in the case of one organization because if there's another representation that hasn't yet started, but it's a possibility, that's off limits if you're ineligible at the outset. Right. And don't forget the chilling effect it has on everybody at other firms as well. They are essentially projecting a message where people at other firms are going to choose. All right, I can either have my security clearance or I can sue the Trump administration, but I can't do both. So this is really I mean, you know, and this gets back to why I think it's important to have really robust relief here. If you find a constitutional violation, because this was not something that was done quietly in order to address the national security context on the QT. This was shouted from the rooftops. And part of the point of shouting it from the rooftops was to get the Paul Weiss's of the world, the Kirkland analysis of the world, the Latham and Watkins of the world to come and make deals with the government and volunteer close to a billion dollars in free legal services. And none of that happens if you don't have Section one, if you don't have Section one broadly and proudly proclaimed. So this really is something where, you know, just looking at it as an ordinary national security deviation, you know, doesn't like begin to describe the problem that is if you find it to be a constitutional problem that the district court judges were trying to remedy. And I would say just one word on the difference between national interest and national security. I mean, I agree with my friend that like national interest is a word that pops up in the Eisenhower order and all that kind of stuff. But I do think it's indicative of the broader problem. And I think most presidents think that everything they do is in the national interest and everything their political opponents do is contrary to the national interest. And so maybe it's just a slip of the tongue. I don't want my case to hang on it because I certainly don't want the executive order to come back with a blue pencil and interest becomes security. But I do think it's revealing. And I think it underscores that, you know, you get discretion as the president in the national security because it's a serious business and you take it very seriously. If you have something that suggests that the process is being used for other purposes, I don't think you get the deference any longer. And I think that's why if you go out and see this deviation from the procedures or you see a policy that is seeming to make this positive, something that probably shouldn't be a consideration at all. I think those are the circumstances. And I don't think Lee has closed that door. I really don't. I don't think you have to have a position on it, but I'm just curious whether you do have a position on whether if the president made an individual determination that I considered this person's character, background, I find that they are not trustworthy to handle classified information and therefore I unilaterally without process revoke their security clearance. Political question or not? You know, look, I'm kind of a unitary executive guy myself, so I'm not going to tell you that if the president does everything that. What's that? Not anymore. No, I really am. I really am. Trust me on that. I really am. Because, you know, I'm not. And this is why I'm going to say, like, you know, specifically on the unitary executive. Like, it doesn't make sense to me to say that if the president does exactly what somebody else in the executive branch is supposed to do, that somehow it's a process file because the president did it himself instead of the agency. So if the president really considered all the 13 factors and came to that conclusion, I think that would not be I think that would be within within the coverage of Levy Garland. This is a matter of black or white. Is the president bound by his own executive orders or other president's executive orders unless he rescinds them or or he just can blow them off? So, I mean, it's probably a fair question for my friend on the other side. And I think sort of the theory is that the president is bound by the executive orders. But I suppose, you know, if you think about some of the arguments that were made in the classification context that, you know, president hands a confidential document to a third party, maybe he's just like instantly declassified it in the same way. You know, I suppose my friend may say that the president's being bound by executive order is kind of self amending. That's really more of a question, I think, for my friend than for me. But I do think in all seriousness, I do think that Greenberg written by Judge Randolph, no opponent of the unitary executive, is fully consistent with the unitary executive theory. I think the position that we are articulating here is fully consistent with the unitary executive. But there's certain things that even the unitary executive cannot do. And and just to sort of I'm happy to kind of go anywhere the court wants to go. But maybe before I sit down, two points I'd like to make. One is, I just think the idea that and I think my friend's position actually depends on the idea this is like the pardon power. And it's just not. I mean, you couldn't have Greenberg for the pardon power. He admitted that Congress could come in and supply some judicially manageable standards. He couldn't do that with respect to the pardon power. And that just shows you that Levy Garland was not saying security clearances are like the pardon power. It was saying these individualized determinations are discretionary, predictive judgments. Those they're based on national security. Those are like the pardon power, but not everything in the process. So it's radically different. And then the second thing is, I mean, if you're looking to bracket a lot of hard issues and decide this case narrowly. I mean, the non severability aspect of this case is a way to essentially say whatever is true security clearances in any other context, whatever is true, your section two stands alone, even whatever is true of section one and section two standing alone. I mean, there's a way to decide this case that just says, look, most of this executive order is clearly retaliatory, problematic, unconstitutional. And we're not going to sort of carve out this one little piece and say that survives. If we go down that road, I mean, I guess the predicate to that would be a severability determination. And the predicate to the severability determination would be that if the president were asked, would you want to have section two alone? If you could get that, even if it didn't have the other parts, would you want it? And we'd have to answer that question. No. I mean, I'm not sure you would, because I'm not sure there's two there's two caveats I would put on this. One is I'm not sure severability analysis works exactly the same way for executive orders and executive rules as it is for statutes. And this court pretty much said as much in API against EPA 862 F third 50. So and it suggests there was a test that was kind of less well salient distinctions. How would that work out in practice in this case so that we're not asking at least a facsimile of that question? I think you'd be asking, you know, like, are you get the exact formulation, but is it substantially certain that he would do it? I mean, it's the burden is essentially on the government. It's a heightened standard. So I think it's still the same inquiry, which is whether this would be something on a standalone basis that would have been done. Maybe there may be a burden of kind of proof question associated with it, but it's still the same. Yeah. And then my second answer would be, I also think, though, you know, this is more an argument from first principles, as opposed to something I can point you to the case. But I think severability analysis should work somewhat differently when you're talking about retaliation, because if the only way you could say, well, yeah, of course, the president will want section two, because if you look at section one, he was trying to retaliate in four different ways. And one, you know, one's better than none. So we'll say he would have wanted to like that. That doesn't strike me. That doesn't feel like a correct analysis. And the other analysis is a matter of retaliation. But once you layer in severability, it just seems like that's what the severability question asks. One last try, if I may. I mean, if you look at the whole women's health case from the Supreme Court, they also said, you know, when doing severability analysis, you have to look at what's the tail and what's the dog. I think the kind of mill locks kind of test that my friend is is advancing is like the classic situation when there's a 16 part piece of legislation and there is like one provision that's unconstitutional. And like, you know, do you bring down the entire Affordable Care Act? Pick one example, because one provision is unconstitutional, right? So that's kind of the situation where the unconstitutional provision is the tail. But when like the unconstitutionality is the dog and there's this little tail where there's a hard issue about just disability, I think it's open to the court to say we're not going to resolve definitively whether Section 2 standing alone would be justiciable. We're going to say these orders were intended to operate as a whole and and should be invalidated as a whole. And whatever is like the last thing I'll say on severability, but I can't think of another severability issue where you have a natural experiment equivalent to the Paul Weiss experience. Because the Paul Weiss order, which in all material respects was identical, was imposed as a whole. Certain adjustments that were described as a change of course, not a newly discovered attentiveness to how to operate a SCIF, but a change of course. And then the whole thing in whole, in toto is revoked. I think with the week, it was a week. It was exactly a week. And so under those circumstances, I think you have kind of unusual proof in the real world that these were intended to operate as a whole. And to the extent they were going to be revoked, they were going to be revoked as a whole. But Section 2 wasn't going to be sitting out there alone. I wonder though if, I mean, severability is a very strange fit for an executive order because an executive order is essentially just a presidential directive. I could take the form of an order. I could take the form of a phone call. I mean, it's, I mean, these things are basically equivalent presidential directive. So I really think the question is, has the district court, I mean, is the injunction an appropriate exercise based on, like, if, you know, we assume that there was some unconstitutional retaliation, is the injunction overly broad? In covering Section 1 or Section 2 or, and that I think is a harder, you know, question for you to answer than just looking at severability, which is, I think, a very uneven fit for executive orders. So I would quibble only so far as the following, which is, I do think an executive order is more like a rule promulgated by an executive agency, and it is an intent to have a formality that, and, you know, and it's presented as a package. So I do think it's more like the legislation, and I think that's particularly true here. I mean, you know, you could have, like, other executive actions, and it's hard to do it if, you know, like, the president, you know, had, like, one of these was televised. These were done with, like, great fanfare precisely because they were executive orders. And so I think, you know, and again, as I noted, like, all of the provisions, including Section 1, follow the phrase, it is order. And I think the executive orders are just binding on the whole administration, every executive branch agency, in a way that a lot of other executive actions are not. And certainly, look, under these injunctions, the president can tweet about anything he wants. I mean, the idea that Section 1 is just ordinary government speech is, with all due respect, not a strong argument. I mean, it is the, you know, literal, like, in the Perkins CUI, it is the stated purpose. In the other three orders, it's the stated background. It clearly directs conduct and informs the conduct that follows in 2 through 5. So I do think these deserve to be enjoined as a whole because they were imposed as a whole, and they were imposed on the whole executive branch. I'm sure my colleagues don't have any additional questions at this time. Thank you, Mr. Connolly. Mr. Connolly, we'll give you the five minutes you asked for, for rebuttal. Thank you, Your Honor, and I'll try to be as succinct as possible. So I wanted to focus a little bit, before I talk about severability, to the extent that it's a question of what the president intended. We don't have to guess at what he intended. We could look at what happened when parts of the executive order were enjoined, and the president still, or the executive branch, enforced the ones that the court didn't enjoin. So that is proof positive that the president would have enforced whatever he could have. And that's all I'll say about severability. But two, I want to talk about it a little bit because I took my colleague's argument to focus a lot about the individualized aspect of security clearance determinations, and I didn't get to talk about that a little bit. So I think there's three problems with that. One, Lee and Egan never said that the determination had to be towards an individual versus a group of people. Two, it runs head on into Egan saying, because Egan says you can deny a clearance for an unspecified reason, so you don't have to say necessarily that you met all these 13 factors or whatnot. And then three, it's unclear what individualized means. The way that my colleague on the other side frames it doesn't mean a presidential memorandum like Zaid, where the person is named, or what happened in JA 2803, where the individuals that got their clearances suspended received a letter saying they got it. I suspect what they're getting after is more of a process type or procedure type argument. But that distinction is illusory. And one, this court's binding precedent in Ryan versus Reno says you can't reframe a challenge to the substance of a clearance as a process one to avoid the Egan bar. And that was in the Title VII context, and Lee obviously expanded that to constitutional claims. Another thing I would say is process is not process for its own sake. It's ultimately geared at something substantive underneath, which in this case is the security clearance determination. And then three, it goes towards my point of what the remedy would be if the determination is not individualized. You would think that it's a remedy, and the strongest out-of-circuit case they have for their proposition is the El-Ghanini case out of the Third Circuit that talks about how you can review the process. But even that one says you can't, the great plaintiff wasn't asking for his security clearance to be restored. So I do think that the whole aspect of it being individualized is really an illusory distinction when you're talking about whether something's reviewable. And that especially goes towards the remedy, which we focused on on page 32 to 33. If the remedy, if the focus was it wasn't individual enough, you would, for instance, order something such as just a, I don't know, before you suspend it to security clearance, do some type of review. But here they ordered security clearances restored, and they said to, quote, in the Perkins, Jenner, and Sussman, EO, quote, to cease any security clearance review made pursuant to sections 1 or 2A of the executive order. So that's also problematic if you're talking about the injury being the lack of individualization. And then three, I want to talk about Greenberg a little bit, because one easy way to distinguish Greenberg is that no one there was asking for their security clearance to be restored. The injury there was the fact that they had to answer these questions that had their own set of injuries separate from whether they got their clearance revoked or not. Greenberg would be a much different case if they said, for instance, on behalf of all these questions, I had to answer honestly, yes, and therefore I lost my security clearance. And so in addition to enjoining this question being asked, also, please restore my security clearances. At that point, I think Greenberg would have been decided much differently, and barring me would have been applicable. And then I just briefly wanted to touch upon Judge colored question about the commercial association. The reason that it's important is because in scale, the District of Columbia, they said freedom of association claims based on commercial associations are foreclosed. So that's foreclosed as a matter of law. And when you look at the reasoning for the president's issues with Mr. Muller and Mr. Wiseman, the issue with their conduct as government officials, which is also not related to their viewpoints or what they were advocating for. It's government conduct, which is subject to the Garcetti v. Sabalos test and would not be protected if that's what the president has a problem with. And then finally, my colleague on the other side mentioned that if there were 10 letters sent out, for instance, and maybe one or two of them were law firms at issue, they wouldn't have any problems. But that's what actually did happen in section four. There were 20 law firms that received letters, only two of which were the plaintiffs and one of which received their letters even before the executive order that they alleged targeted them came out. So really only 5% of the universe was in reaction to the executive order. And with that, I see my time is up, but I'm happy. I didn't want to interrupt your rebuttal, but I just had one really quick question. You pointed to page 32 and 33 of your brief. That's not a place in which you made an argument that was specifically about the remedy. It was, as I understand it, it was in a place where you made an argument about justice stability that made a point about the remedy, but it was really part of the justice stability argument. Yes, Your Honor, but we pointed out that the remedy was also problematic. So the court can't, you know, if the injury was individualized, they can't just order security clearances to be determined to be restored as was part of my point. And then the other thing I did want to talk briefly on CFIUS v. Rawls, that was more of a statutory bar case, a statute from Congress barred review. That's much different than political question in the sense of if there's a constitutional commitment to the executive, which is what you have here, and that's an easy way to distinguish it from CFIUS v. Rawls. Excuse me, the Rawls case, and in other ways, obviously that wasn't talked about. It may well be that that case comes up in the next set of arguments that we'll have momentarily. Yep. So that's all that I have unless the court has any more questions for me. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Rao